# Exhibit A

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1432 |
| | : | (MJD) |
| This Document Relates to | : | |
| ALLIE MAE HOGAN, et al v. BAYER CORPORATION, ET AL. | : : | Case No. 02-cv-0451 |

**DEPOSITION OF MAIRUS T. McFARLAND, M.D.**
**SEPTEMBER 19, 2006**

Reported by:
Karen Tyler, CSR, CCR, CRR
Registered Diplomate Reporter
Notary Public

ORIGINAL

**MAIRUS T. McFARLAND, M.D.**

having been called as a witness in the above matter, and after having been first duly sworn was examined and testified as follows beginning at 2:01 p.m.:

EXAMINATION

BY MR. ROTOLO:

Q. Doctor, my name is Peter Rotolo, and we met before the deposition today, and we're here this afternoon to talk to you about Allie Hogan and your expert report with regard to Ms. Hogan. Before we begin I'd like to mark the notice of deposition as Exhibit 1 for the record, and just as clarification, Ms. Hogan's deposition was originally scheduled for tomorrow but because we had some extra time today, by agreement of all parties we've agreed to go ahead and do it now, today.

(McFarland Deposition Exhibit No. 1 was marked for identification.)

A. I also wanted to state for the record that, again, I booked the whole day for tomorrow so even though we're covering this today, I'm still scheduled for all day tomorrow.

Q. That's fine.

A. All right.

Q. So the information under history of present illness would be basically your, your summary and sometimes verbatim of what she told you were her complaints and problems at the time you saw her.

A. That's correct.

Q. So these are her words basically and not yours.

A. That's, that's correct.

Q. And you indicate in that history of present illness that she's a 60-year-old black female who has a history of ingesting Baycol for treatment of her cholesterol and I assume that's something she told you, that she had used Baycol.

A. That's right.

Q. And it indicates here, Doctor, it says, I did review her old records which date from May of '99 through January of 2000.

A. So I did review some records for her.

Q. Would it be fair to say that, Doctor, that you only reviewed records, whatever they may be, that were from May of '99 through January of 2000?

A. Right.

Q. So you, you would have reviewed basically

six months of her medical records.
A. That's about right.
Q. Do you remember, Doctor, where those medical records were from?
A. They would have come from the attorney's office.
Q. Do you remember specifically what medical providers that they were that you reviewed?
A. No, I didn't make a note, so I don't remember.
Q. Then it says, patient reports, and that would be what Ms. Hogan told you, correct?
A. That's right. That's right.
Q. That she did take this medicine, I assume referring to Baycol.
A. Right.
Q. For over a year's time. So that would be something that she reported to you about her Baycol usage.
A. That's correct.
Q. She has a history of diabetes, CVA, Doctor, would that be an abbreviation for cerebrovascular accident?
A. That's correct.
Q. Which occurred two years ago affecting

Q. And Clonidine?

A. Clonidine, it's a blood pressure agent.

Q. Doctor, when you, when Ms. Hogan gave you her history, were you aware that she had significant hypertension for the last 30 to 40 years?

A. No, sir.

Q. She did not mention her bouts of uncontrolled hypertension to you in her history of present illness, did she?

A. No, she did not.

Q. And so you weren't aware of that at that time.

A. No.

Q. I assume you were aware she had some sort of blood pressure issue because she was on various medications for blood pressure; is that correct?

A. That is correct.

Q. Under habits she reports that she does not use alcohol and smokeless tobacco but she does smoke a pack of cigarettes a day; is that correct?

A. That's correct.

Q. And then under social history, she is married, unemployed and accompanied by her daughter.

A. (Nods head, yes.)
Q. So her daughter was here the day of her visit with you; is that correct?
A. That's correct.
Q. And then under family history, she reported that both her parents are deceased but she did not know their cause of death.
A. (Nods head, yes.) That's correct.
Q. Now, Doctor, under your review of symptoms, is this again based on what Ms. Hogan has told you in answer to specific questions that you have asked her?
A. Yes.
Q. And so, again, this would be subjective information on which you would have to rely on what Ms. Hogan told you to include this in the section report.
A. Yes.
Q. And she reports to you that she doesn't have any fatigue and it appears that, and, Doctor, you can read this to yourself, but it appears that the only things that she complains of that are, were somewhat abnormal were left-sided weakness and generalized musculoskeletal pain as described above, I would assume in the history of present

illness.

A. Yes.

Q. Is that correct?

A. That is correct.

Q. And everything else she reported to you was within normal limits.

A. That's correct.

Q. Doctor, on your page two of the, of your report, under objective information, this would be, my understanding would be the results of your actual physical examination of Ms. Hogan; is that correct?

A. Yes, sir, it is.

Q. And looking at that examination in your notes there, it appears to me that you made the determination that Ms. Hogan was obese.

THE WITNESS: Excuse me one second.

MR. ROTOLO: Sure.

(Recess from 2:17 p.m. to 2:18 p.m.)

Q. (By Mr. Rotolo) Doctor, when we broke we were talking about the objective information, and I believe I had asked you whether that would be the results of your actual examination of Ms. Hogan; is that correct?

A. Yes, it is.

from her that, number one, she had musculoskeletal pain and weakness, and that was your assessment based on the day that you saw her; is that correct?

A. That is correct.

Q. That she had malignant hypertension; in other words, she had high blood pressure.

A. Right.

Q. What, what do you mean by malignant, can you give us a lay term of what you mean by --

A. With her blood pressure being this high, malignant hypertension is usually a more chronic condition, more aggressive form of hypertension than just moderate or mild hypertension. In my opinion she was really going to be malignant hypertension especially with the doses of medicines that she's on, and despite those medicines, the level of her blood pressure.

Q. So she was having somewhat of a difficult time controlling her hypertension even with the high doses of medication.

A. Well, on this particular day her blood pressure was most definitely high.

Q. And, Doctor, would you agree that uncontrolled hypertension can lead to a

cerebrovascular accident?

A. Yes, sir.

Q. She was also suffering from type II diabetes mellitus?

A. Yes, sir.

Q. And she was on medication for her diabetes at that time.

A. Right.

Q. Being the time that you saw her.

A. Yes.

Q. And then number four was paresthesias involving the left upper and lower extremity.

A. (Nods head, yes.)

Q. And that was the, with regard to her left foot and the walking with the limp; is that correct, Doctor? Is that what that refers to?

A. Well, actually I was looking back, in her medical history she did tell me that she had a stroke or CVA, and usually in the assessment I would have placed that in there because she did give me that history. It looks like I inadvertently left that CVA off. The other thought that I was having about that is that if the left lower extremity changes, if I associate that or if they give me the history like she did

occurring with the stroke, usually I'll write it as a left hemiparesis and write CVA with left hemiparesis rather than paresthesias of the left upper and lower extremities, but on that particular day I documented paresthesias, there was numbness, loss of sensation in the left upper and lower extremities, and that's how I documented it. Not, not sure if I documented like that because I did not have any old records to prove that it really was a stroke or not but that's the way I documented it.

Q. Doctor, is number four, the paresthesias involving the left upper and lower extremity, is that something that could result from a stroke?

A. Yes.

Q. Doctor, is it fair to say that your assessments that you rendered in your two-page report, those were based on the history that you received from Ms. Hogan as well as your physical examination of her on May the 10th of 2004?

A. That is correct.

Q. If the history was, if her medical history was different than what she relayed to you on May the 10th of 2004, is it fair to say that your opinions could be affected by the change in

that history?
A. Yes, it is.
Q. And then under your plan, Doctor, you said, this patient has multiple medical illnesses which are followed at LSU. So apparently she told you that she was going to LSU for her, for her medical conditions; is that correct?
A. That is correct.
Q. And you said, I'll report these findings to her attorney and provide any further assistance as needed. I have reviewed the old records presented to me extensively and discussed the findings with this patient.
Again, Doctor, do you think you reviewed any medical records in this case?
A. Yes, I do. I wrote it here, and I wouldn't have written it if I had not actually done it.
Q. But you don't remember what records those were.
A. No, I do not.
Q. And you still don't have, you don't have those records in your possession; is that correct?
A. No, I do not. That's correct.
Q. And you say, by way of history from

period she was in the hospital for the stroke her medication was changed from Baycol to Lipitor, I think as a result of an attempt to get her cholesterol down further.

Ms. Hogan testified in her deposition, and I want to read this to you, and it was also noted in Dr. Powell's deposition, in a May 7th, 2001 visit to the doctor she indicated that she had ran out of her Baycol for several months and had not taken it for several months before that period of time. So apparently she did not take it all the way up to the time of her stroke due to various reasons.

Doctor, would that be a significant factor in determining whether events occurring before or after her use of Baycol, knowing exactly when she used it?

A. Yes, it would.

Q. And according to her, when I asked her what her complaints were with regard to Baycol, what Ms. Hogan told me in her deposition was the only thing that she thinks was caused by Baycol or that she associates with Baycol were pain in her left leg, and she indicated the pain was only in her left leg and not in her right leg. And she

go to LSU to have that done.

And then I asked him again, question, on page 30, if I understand your testimony and your records correct she was complaining that her hip was hurting before she fell and reported that the trauma of falling was not when her hip started hurting, and he said, that's correct.

And Dr. Taylor testified that a stress fracture in her femur could lead to weakness of the hip and of the leg; is that also your opinion, Doctor?

A. Yes.

Q. Doctor, if the medical, assume for me that the medical records do not show any complaints of weakness in Ms. Hogan's left extremities until after she had her stroke at which time she was taken off Baycol and that as you indicated in your report those problems continue up until the date you examine her and the date I deposed her back, back on April the 5th of '06, does that lead to the conclusion, Doctor, in your medical opinion that Baycol was not the cause of her extremity, lower extremity weakness that she complains of?

A. Yes.

your name and address and the date.

A. That's correct.

Q. And the reason that this document has not been signed by you is because the opinions contained herein are not something you can testify to; is that correct?

A. That is correct.

Q. So the, under five, the A, B and C is not something that you're going to give an opinion about in this case.

A. No, I'm not.

Q. And under 6A through E, those are not things that you can testify about with regard to this matter.

A. That's right.

Q. And under F and G, those two really should be one, it's by way of history that you have determined that Baycol appears to have been a contributing cause to the patient's condition.

A. That's correct.

Q. And as we determined, if that history changes as we have gone through, then that opinion may change.

A. That's correct.

Q. Doctor, after having gone through

Ms. Hogan's medical history, is it your opinion and will you give an opinion in this case that Baycol caused her any sort of injury or problem.

A. No.

Q. So that would, it is your opinion that Baycol did not cause her any sort of injury or problem that you can tell from what you've reviewed and the history we've gone over?

A. That's correct.

MR. ROTOLO: Can you give us like five minutes and we'll break.

THE WITNESS: Sure. Sure.

(Recess from 2:44 p.m. to 2:45 p.m.)

MR. ROTOLO: Just a couple more questions, Doctor.

THE WITNESS: All right.

Q. (By Mr. Rotolo) Doctor, in the plan portion of your report on page two of your dictation, is it fair to say that the association that you indicate there between Baycol and Ms. Hogan's injuries was Ms. Hogan's belief that Baycol caused these injuries.

A. That's correct.

Q. And from what you found, Doctor, in your examination of her and the complaints that she

made, those complaints with, of the musculoskeletal pain and weakness, especially the weakness in her extremities on the left side, those can all be explained by the stroke that Ms. Hogan had that affected her left side; is that correct?

A. That's correct.

MR. ROTOLO: Doctor, I think that's all the questions I have. Any questions?

MR. DAVIDSON: I don't have any questions.

MR. ROTOLO: Ben, do you have any questions?

MR. RODGERS: No, I don't, Peter, thank you.

MR. ROTOLO: All right. I think that's all, Doctor, for today.

(Whereupon, the witness was excused and the deposition concluded at 2:46 p.m.)

///

///

///

///

///

///

# Exhibit B

UNITED STATES DISTRICT COURT
STATE OF MINNESOTA

IN RE BAYCOL PRODUCTS LITIGATION
ALLIE MAE HOGAN MDL NO. 1431
VERSUS
BAYER CORPORATION, ET AL. CASE NO. 02-CV-0451

DEPOSITION OF DEANNA POWELL, MD
Taken on June 14, 2006

Reported By:
Jeanne Bain, CCR
Official Court Reporter

DEANNA POWELL, MD

having been called as a witness in the above matter and after having been first duly sworn was examined and testified as follows:

EXAMINATION BY
MR. YOUNG:

Q. Good afternoon, Dr. Powell. My name is Jay Young, and I represent Bayer Corporation.

MR. YOUNG: For the record, we are beginning the deposition at 1:20. Counsel for GSK has just arrived, and counsel for plaintiff has not arrived nor called nor contacted me to delay the deposition, so we are going to begin. The deposition was noticed for 1:00 o'clock, June 14th.

Q. (By Mr. Young) Dr. Powell, could I get you to begin by giving me your full name and your professional address for the record, please?
A. I am Deanna Lynn Powell, and I am Assistant Professor for the faculty, on faculty at Family Medicine Department at LSU Health Sciences Center in Shreveport, Louisiana.
Q. Doctor, would you like to read and sign your deposition today?
A. Yes.

A. Typically, yes.
Q. And do you also make referrals for, if there are special problems such as cardiology or nephrology, epidemiology, that type of thing?
A. We do.
Q. You refer out?
A. Yes.
Q. During, when we looked at your CV, you mentioned you were no longer a member of the American Medical Association; is that correct?
A. That's correct.
Q. Can you tell me why?
A. There wasn't much in return for the payment. The fee appeared to be simply to have it said that I'm a member of the AMA. You didn't get a lot in return for the money.
Q. In terms of women's health issues, what particular area do you concentrate on?
A. In particular gynecologic.
Q. Doctor, the primary reason we asked to take your deposition today is because, according to the Volume 1 of the records, it appears that in November, November 12th of 1998 you saw Allie Mae Hogan and initially prescribed Baycol. Have you - were you - are you able to find that

A. The usual precautions are that we ask them to be alert for any muscle pains or aches that begin after initiating the medication. If those occur, they're asked to stop the medication immediately and call us or let us know in some way. If they can't get in touch with the clinic, which is sometimes a problem, simply stop the medicine and let us know on their next visit. They're also asked to look for anything -
Q. Unusual?
A. Anything unusual after the medication starts.
Q. Looking at the chart from that date, what were Ms. Hogan's existing medical problems that she was being treated for?
A. On this visit we listed as diagnoses hypertension, diabetes mellitis, decreased sexual drive and hypercholesterol. It was also noted that she had some complaints of heartburn, although that was not listed as a diagnosis under our clinic impression.
Q. And can you tell from the chart what medications she was on at the time of the visit before she was placed on Baycol?
A. At the initiation of this visit, she was

not see any specific mention of muscle pain.
Q. And with the diabetes that she had been diagnosed with would have been Type 2 or adult onset?
A. It does not specifically say here, but I would hazard that as my first guess.
Q. Was her blood pressure under control at the time of the visit?
A. No.
Q. It was above recommended levels; correct?
A. The readings here were slightly high for the guidelines at that time.
Q. Okay. What - was her weight noted on this visit?
A. Yes.
Q. And what was it?
A. 240.4 pounds.
Q. She would have been considered obese?
A. Yes.
Q. Morbidly obese?
A. Yes.
Q. What risk factors for stroke would, are you able to identify from the, from this initial encounter?
A. Her high blood pressure, her weight. I am

not certain offhand of the recognized risk factors for cerebral vascular accident by itself. I would consider her diabetes, her weight, her blood pressure to be the major risk factors identified from this sheet, and cholesterol. But I think that the guidelines would state just the cholesterol and the hypertension are noted to be official risk factors. I would need to double check that.
Q. That's fine. Would the fact that she was diabetic in and of itself warrant the prescribing of the statin?
A. Are you asking me that from this point in time or from today?
Q. Okay. Let's start from in this point in time.
A. At this point in time, no, diabetes by itself would not be enough to warrant a statin prescription.
Q. Today?
A. Yes.
Q. So that has changed over time?
A. That has changed.
Q. What then was the reason for prescribing Baycol to her at that time?

A. Her cholesterol was elevated.
Q. And do you have notes in the chart as to what the readings were at that time?
A. Yes. I have notes where they had measured it in January of that year and had a level of cholesterol of 237.
Q. And the target at that time for her would have been what, Doctor?
A. I believe that was, at that point in time, under 200 was what our goal would be.
Q. And she also had elevated -
A. Triglycerides.
Q. - triglycerides and also LDL?
A. Yes.
Q. And Baycol was prescribed to lower all of those; is that correct?
A. Yes.
Q. Do you also make it your practice to discuss with the patient possible liver, the fact that a statin can possibly affect their liver?
A. Yes.
Q. Okay. And what is your, what was your practice at that time in terms of liver function studies?

A. This clinic sheet indicates that the patient had a history of degenerative joint disease.
Q. And what joints were involved?
A. Specifically, this clinic sheet notes the upper extremities and the knees.
Q. Would that include, the upper extremities include the shoulders?
A. It does not state, but it could.
Q. Her blood pressure was somewhat better controlled at this visit; is that correct? 147 over 88?
A. Her manual reading was 150 over 90. I would state that she was no better controlled than she was on the first visit.
Q. Okay. Is there another reading other than the one at the top?
A. Under Number 1, hypertension, today BP 150 over 90. That would be the manual reading that the student took during the visit.
Q. Okay. And the reading earlier, the one further up, would have been done by the nurse?
A. It would have been done on a machine.
Q. And you - is it - are the manual readings -

Q. In addition to controlling that with medication?
A. Sometimes instead of. That is considered first which is why we do it upon diagnosis.
Q. And when a patient continues to demonstrate elevated blood sugars or elevated glucose levels, then they may be referred for additional instruction?
A. It depends.
Q. Okay.
A. Yes, that is a possibility.
Q. I see a note that in February of 2000 that Mrs. Hogan was referred for diabetic teaching on a 1500 calorie ADA meal plan.
A. Okay. Yes.
Q. So that would have been after her diagnosis of diabetes?
A. Yes.
Q. But would have been in an effort to, again, help her better control those levels?
A. Yes. Sometimes it gives them better motivation when people talk with them and encourage them.
Q. Doctor, the next note that I need you to look at is April 10th of 2000.

A. Yes. I see that here.
Q. The indication here is that, at least from my notes, is that she was doing well but at that visit both her Glucophage and her Baycol were increased; is that correct?
A. It states that the patient stated she was doing well.
Q. So she had no, she voiced no complaints?
A. Not according to this note.
Q. If you look at -
A. The measured blood pressure and sugar on that visit were both abnormal.
Q. So medically she was not maybe doing as well as she thought she was?
A. Yes.
Q. And who did she see? Again, this appears to be Dr. Liu; correct?
A. It is Dr. Liu.
Q. I may have asked this, and I apologize. Is Dr. Liu - Dr. Liu is no longer here?
A. She is not.
Q. Do you know where she is?
A. I do not.
Q. Do you know her full name?
A. No, I do not.

Q. L-u-i?
A. L-i-u.
Q. L-i-u?
A. L-i-u is the last name, and the problem is, I don't know which is her last name. We call her - she was Dr. Liu. I believe Liu was her last name. The other name we knew was Chong, C-h-o-n-g, but I do not know if that was first, second. I just don't know the order of her name officially.
Q. Okay. She was obviously from overseas. Do you know from where she was?
A. No, I do not.
Q. That may be a Chinese name. I'm not certain.
A. It could be. I don't know.
Q. It could be. Not someone that you - you remember her, but you do not -
A. I do remember her. I just don't know those details.
Q. You would agree that on this visit that Dr. Liu increased her Baycol to .4 milligrams?
A. Yes. That is what is -
Q. And from -
A. - documented here.

A. I do not see any acute new complaints on this chart sheet.

Q. He was again following her history of hypertension, diabetes and hypercholesterolemia; correct?

A. Yes.

Q. And also he, in terms of current medications, Baycol at .4 milligrams is noted; correct?

A. Yes.

Q. Any lab work this day, Doctor?

A. They drew an A1c and, of course, stuck her finger.

Q. All right. And his clinical impressions, hypertension, diabetes uncontrolled, elevated cholesterol and morbid obesity; correct?

A. Yes.

Q. Can you help me interpret his plan of care?

A. Will increase Quanadine to 0.3 milligrams poq/day, that appears to be.

Q. And that -

A. But that is, does not make sense. I'm not certain of the dosing interval he intended there because she was already on bid dosing.

Q. Did you find it?
A. No, not yet. I found it. There it is.
Q. And, again, I think we're back to Dr. Liu.
A. Yes.
Q. As opposed to Dr. Lau. All right. Of note here, Dr. Liu notes that the patient reported that she had run out of Baycol for several months and she had no money for medicines; is that correct?
A. Yes. That is what it states.
Q. Did she have any complaints that day?
A. There is a notation here that she reported polyurea and polydipsia.
Q. We talked about polyurea. What is polydipsia?
A. Polydipsia is extreme thirst.
Q. That's a diabetes symptom, is it not?
A. That is a symptom associated with uncontrolled diabetes.
Q. And were labs - labs were drawn that day; correct?
A. Yes.
Q. Do you think we could find that report?
A. Oh, I think we could eventually. 5/7/2001, comprehensive medical panel -

metabolic panel. Sorry.
Q. Okay. What, if any, of her readings were out of the normal range?
A. Her sugar was elevated. The BUN was slightly elevated. Albumin was slightly low. ALT was a little bit low. Cholesterol, triglyceride and LDL were elevated, and her A1c was elevated.
Q. Are these lab results unusual for someone who has been off her medications for a couple of months, or is that what you would expect?
A. These lab results are abnormal but not unexpected regarding, with regards to her not having been able to take the medication.
Q. And, again, there are no complaints noted in the record of, that would be consistent with an adverse reaction to Baycol?
A. That is correct.
Q. Doctor, are you familiar with a condition known as rhabdomyolysis?
A. I am.
Q. In reviewing the chart up to now, we have seen no indication that Mrs. Hogan was ever diagnosed with rhabdomyolysis; correct?
A. That is correct.

Q. Before we went back to the May 7th visit, you had noted that she was seen in the emergency room in May, and I think there's a discharge summary which indicates that she was admitted for cerebral vascular accident.
A. Yes.
Q. Did you see that?
A. Yes.
Q. During the encounter at LSU for the stroke, she was, her Baycol was discontinued and she was put on Lipitor.
A. Are you asking that I confirm that?
Q. Well, I would like you to see if you can confirm that. I believe it's in the discharge summary.
A. This states that she was started on Lipitor instead of Baycol.
Q. Okay. And that - is there any indication, Doctor, as to why her medication was changed?
A. They state in an addendum to the discharge summary, cholesterol on 5/07 was 273, PT 229, HDL 43 and LDL 187, so we started her on Lipitor, 10 milligrams qhs. Whether that is actually an explanation as to why they made the change, I'm

Q. I will tell you, Doctor, from my review of the chart, following her being placed on Lipitor, as far as I can tell, LSU never prescribed Baycol for her further. So is it fair to say, Doctor, from the review of the primary care progress notes that during the time she was on Baycol, from the time it was first prescribed until it was changed following her stroke, that we didn't, you were not able to identify any complaints during that period of time that would be consistent with an adverse reaction to Baycol?
A. That is a fair statement, yes.
Q. Okay. Doctor, you mentioned earlier that in looking through the more recent chart that you did see where you had had some involvement with this patient.
A. While looking at these papers, I've seen one in here.
Q. Oh, did you?
A. Yes.
Q. Well, could you point that out?
A. My handwriting is on July 23rd, 2001. This was follow-up for her hospitalization.
Q. Okay. Let me get that. Ah hah.

# Exhibit C

22089

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1432 |
| | : | |
| | : | (MJD) |
| This Document Relates to | : | |
| | : | |
| ALLIE MAE HOGAN, ET AL. v. | : | Case No. 02-cv-0451 |
| BAYER CORPORATION, ET AL. | : | |



**DEPOSITION OF DONALD R. TAYLOR, M.D.**
**JUNE 20, 2006**

Reported by:
Jeanne Bain, CCR
Official Court Reporter

ORIGINAL

Karen Tyler Reporting
3000 Fairfield Avenue, Suite A
Shreveport, Louisiana 71104-2930
(318) 424-1707 • Fax (318) 424-1744

DONALD R. TAYLOR, M.D.

having been called as a witness in the above matter and after having been first duly sworn was examined and testified as follows:

EXAMINATION

BY MR. ROTOLO:

Q. Good afternoon Dr. Taylor, name is Peter Rotolo and I represent Bayer Corporation in this lawsuit that Ms. Logan has filed against Bayer and GlaxoSmithKline. Could you please state your name for the record to begin with?

A. Donald R. Taylor.

Q. And your address.

A. My office address is 130 Jefferson Street, Mansfield, Louisiana 71052.

Q. And Doctor, I assume you have had your deposition taken many times before.

A. Yes, I have.

Q. Do you remember ever giving a deposition on a case that concerned a statin drug or a cholesterol drug?

A. No. I have no times that I have given any deposition regarding the statin drugs.

Q. Let me ask you, if before this deposition, you have talked to Ms. Hogan about this case or

A. Yes, it does.

Q. I guess that would include the spectrum of any problems that the patient population may have?

A. Yes, it does.

Q. And that if it is outside your realm you refer them to a specialist to treat them further?

A. Yes, I do.

Q. Let me talk specifically, we may go back to some stuff about your practice a little bit later, about Ms. Hogan. The records that we've obtained from your office by subpoena or medical authorization indicate, at least the records we've obtained, that the first record I have is back in 1992. Is that about when your records start you seeing her?

A. Yes, it does. My first record of seeing her was January 23rd of 1992.

Q. And on that date I believe she came to see you because a blood pressure problem.

A. Yes.

Q. And I note, in that record, that she had obviously been seeing another physician prior to that time that had put her on some medication. Do you have any record of who that was?

Allie was the type of person, if she was doing fine, sometimes, she neglected herself and she neglected her medicines. We would see her as an emergency from time to time here in the office because of that fact.

Q. I note on the record of January 23rd of 1992, you make a notation that she had been out of her Procardia for two weeks.

A. Yes.

Q. Was that, in your opinion at that time, what had resulted in her blood pressure going up again?

A. Yes, it was.

Q. And some of these visits I am not going to go into a lot of detail, but on February 18th of '93, is that the next visit that you have for her?

A. Yes, it is.

Q. And on that date she came to you complaining of hypertension headache and edema, or swelling of the ankles, and hot flashes?

A. Yes.

Q. And I assume, on that time, you did your normal exam.

A. Yes, I did.

Q. And you added some additional medication, at that time, in attempt to get her blood pressure back down.
A. Yes, I did.
Q. And I believe you told her to follow up in two weeks if she needed to. Is that correct?
A. That's correct.
Q. And then she came back to see you on September 10th of 1993.
A. That's correct.
Q. Can you tell what her complaints were and what your findings were on that day?
A. At that time she was feeling better, as far as her blood pressure. Her blood pressure was better controlled on that date, and I felt that she was doing better in, regarding her blood pressure medication. She has a job interview at Tyson's Food, and I felt that she could carry on normal work activities if she would take her medications and follow the directions for diet and exercise and so forth.
Q. Doctor, did you find with Ms. Hogan, that it was sometimes a struggle to get her to to comply with your medication orders?
A. I felt it was almost impossible to treat

Allie Hogan at times, although, only in emergency cases because, again, she was going to LSU Medical Center in Shreveport for her primary care.

Q. The next visit I have is November 22nd of 1993. Is that the next one you chart?

A. Yes.

Q. At that point she was complaining of some tendinitis in her right wrist.

A. Yes.

Q. And she related that to her job of pulling gizzards at Tyson's Food.

A. Yes.

Q. And you prescribed her medication to help her deal with that problem, as well.

A. Yes, I did.

Q. And then she came back, as a follow up, on November 30th of 1993.

A. Yes.

Q. She reported some improvement with her tendinitis.

A. Yes.

Q. And you continued her on her medication in an attempt to get that condition under control.

A. Yes, I did.

Q. The next visit I have is December 14th of 1993.
A. Yes.
Q. Can you tell what her complaints were on that day?
A. She came back with recurring tendinitis of the right and left wrists. She states that she was having trouble with her left fingers remaining swollen, and clinically, she continued to have pain in the left wrist and the right wrist. She had been out of her Naprosyn, but she states it helped while she was taking it. At that time, do to her continued pain, the swelling, and the discomfort, I made her an appointment with Dr. Gordon Mead, an orthopedic physician, for evaluation for the following Thursday, and she was instructed also at that time, because her medication, her blood pressure was elevated, that she was to get back on her blood pressure medications and take them appropriately.
Q. You found at that visit that she had not been taking her blood pressure medication.
A. Yes, I had. She had been out of her Naprosyn and her blood pressure medication.

Q. And that's what resulted in her blood pressure increasing.
A. Yes.
Q. Do you know if she saw Dr. Mead?
A. Yes, she did see Dr. Mead.
Q. I didn't see any consultation in your files. Is that something you normally would not get?
A. Yes. I have those consultations, but that would not be something that I could refer to you, to give you, that would be from Dr. Mead. She did respond to treatment with Dr. Mead from the stand point of her tendinitis.
Q. The next visit I have is April 5th of 1994.
A. Yes.
Q. Apparently, she was having a significant episode with her blood pressure on that day, Doctor?
A. Yes.
Q. Can you tell me what her complaints were?
A. She came in that day and states that she had been up all night working, was tired, and got in to an argument that A.M. Her blood pressure went up after the argument. She was seen in my office, and due to the marked elevation of her

blood pressure, again, she was treated Catapres .2mg orally, and her blood pressure came down to an acceptable degree. I placed her on rest at that time until her blood pressure improved, and she was to see me the following day for follow-up examination and blood pressure check.

She also complained that day of numbness of her fingertips, and I feel that this probably was due to the basis, her marked hypertension episode that she had. It made me worry to the fact that this patient could have signs of a cerebral vascular incident or thrombosis or a common name, stroke, if she continued with her hypertensive episodes and also with her noncompliance.

At that time I felt due to these symptoms, that I would follow her very closely with her blood pressure, and that she was to continue her Calan SR180, one daily, and her Amitriptyline 25mg bid for her anxiety. She was instructed to come back for follow-up exam, and that she would be placed on light duty, if her, blood pressure was controlled.

Q. Doctor, one of the risks of high blood pressure is cerebral vascular incident or a

stroke, is that correct?
A. That's correct.
Q. You were concerned at that point because of the tingling and numbness in her fingertips that potentially could be the beginning of some sort of vascular incident.
A. Yes.
Q. And you related that to her uncontrolled blood pressure due to the fact she wasn't complying with her medication.
A. Yes.
Q. I notice the next visit is over a year later on September 19th of 1995. Is that correct?
A. That's correct.
Q. And I noted, in your record, that you indicated that she has been out of her pills for over a year. I assume you are referring to her blood pressure medication.
A. Yes.
Q. So Ms. Hogan had been not taking her blood pressure medication for over a year at that point.
A. She was noncompliant for a year at that point, yes.

you had put her on.
A. Yes.
Q. And then she saw you again on December the 6th of 1995.
A. Yes, she did.
Q. Can you tell me what her complaints were at that point?
A. She complained of arthritis of the right hip and pain in the ribcage area with arthritic complaints, I thought at the time. She did have a long history of the hypertension, and she has not been medically compliant, but she was instructed to get back closely, again, on her medications. She was given Celestone 1 1/2 cc IM for her arthritis and her arthritic pains. She was placed on Ibuprofen 800mg, three times a day, and Genagesic Tabs, as needed for pain.
Q. So back in December of '95, she came to see you, I would, supposed kind of on an emergency basis, due to some pain in her right hip.
A. Yes.
Q. And you diagnosed that as arthritis of her right hip.
A. Yes, I did.